**DAVID H. ANGELI**, OSB No. 020244
david@angelilaw.com
**JOANNA T. PERINI-ABBOTT**, OSB No. 14139
joanna@angelilaw.com
ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

**JOSEPH M. MILLER**, DC Bar No. 439965, *pro hac vice pending*
JoeMiller@crowell.com
**ROBERT B. MCNARY**, Cal. Bar No. 253745, *pro hac vice pending*
RMcNary@crowell.com
**SHANE WAGMAN ROMERO**, Cal. Bar No. 283503, *pro hac vice pending*
SRomero@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
202.624.2500

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| TRILLIUM COMMUNITY HEALTH PLAN,<br><br>　　　　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>LEGACY HEALTH, PROVIDENCE HEALTH & SERVICES OREGON, JOHN G. HUNTER in his official capacity as CEO of OHSU Health System, and JEFFREY CONKLIN, in his official capacity as Chief Payor Strategy Officer of OHSU,<br><br>　　　　　　　　　　　　　Defendants. | Case No.: _____<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**<br><br>(Violation of the Sherman Antitrust Act, 15 U.S.C. § 1)<br><br>DEMAND FOR JURY TRIAL |

PAGE 1 – COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

1.     Plaintiff Trillium Community Health Plan ("Trillium") alleges against Defendants Legacy Health ("Legacy"), Providence Health & Service ("Providence"), John G. Hunter, M.D., in his official capacity as Executive Vice President of Oregon Health & Science University ("OHSU") and CEO of the OHSU Health System, and Jeffrey Conklin, in his official capacity as Chief Payor Strategy Officer, OHSU, on information and belief as follows:

**I.     INTRODUCTION**

2.     This Complaint concerns a group boycott by Legacy, Providence, and OHSU ("the Big Three") in violation of federal antitrust law. Trillium is a Coordinated Care Organization ("CCO") that provides health services to some of the most vulnerable members of Oregon's community: Oregon Health Plan ("OHP") members. The Big Three run the three largest health systems in Multnomah, Clackamas, and Washington counties ("the Tri-County Area" or "the Portland Metropolitan Area"), and have entered into an agreement to thwart Trillium's entry into the market for coordinated care services in the Tri-County Area, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Under this agreement, the Big Three are engaging in a concerted refusal to contract with Trillium.

3.     Since at least February 2019, the Big Three have collusively agreed to refuse to contract their hospital and physician networks with Trillium. The Big Three dominate the provider market, collectively controlling the eleven largest hospitals in the Tri-County Area, and their associated physician groups. As the Big Three control effectively 100% of the potentially available Tri-County Area in-patient hospital market, contracts with Legacy, Providence, and OHSU are essential to serving the Medicaid population in the Tri-County Area.[1] There are no substitutes for the Big Three's physician networks, and these primary physician provider

---

[1] Kaiser Permanente is also present in the Tri-County Area, but is only available on a contractual basis to its own Kaiser health plan members. Moreover, Kaiser also contracts with the Defendants to offer in-patient hospital services to Kaiser health plan members.

PAGE 2 – COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

contracts with the Big Three are necessary for a CCO to reach network adequacy to serve the Medicaid population in the Tri-County Area.

4. Since at least February 2019, the Big Three have been committed to a single CCO controlling the Tri-County Area: their co-conspirator Health Share of Oregon ("Health Share"), the incumbent CCO of which the Big Three are founding members and continue to have governing authority. Proof of the Big Three's illegal agreement to exclude Trillium includes their similar responses to Trillium, along with their statements against individual interest conceding their collective focus on supporting Health Share. Indeed, on February 28, 2019, after each member of the Big Three had considered, and then rejected, the possibility of submitting its own CCO application, Trillium was told by Legacy that the Big Three had agreed on a "truce," and that any "defection" by a member of the Big Three contracting with a CCO besides Health Share would be a problem.

5. The Big Three's illegal boycott against Trillium is thwarting Oregon's considered decision to offer choice to Medicaid recipients in the Tri-County Area. The boycott aims to block Trillium from obtaining a sufficient health network, and either force it from the market or reduce its member allocation to a point at which Trillium's business is not viable. The Big Three entered into this illegal agreement to protect the member allocation of the incumbent CCO, Health Share.

6. The Big Three's illegal boycott is a *per se* violation of the Sherman Act, and this anticompetitive agreement, unless enjoined, will prevent competition in the Tri-County area Medicaid managed care market. The Defendants' and Co-Conspirators' illegal agreement should be enjoined and declared illegal under Section 1 of the Sherman Act, so that good faith negotiations can promptly begin and the competitive market restored. Legacy and Providence should also be found liable for treble damages caused by their antitrust violations, in addition to attorney's fees and litigation costs.

PAGE 3 – COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

## II.  PARTIES

7. Plaintiff Trillium Community Health Plan, Inc. ("Trillium") is a corporation organized and existing under the laws Oregon with its principal place of business in Eugene, Oregon. Trillium is a wholly-owned subsidiary of Agate Resources, Inc. which is a wholly-owned subsidiary of Centene Corporation.

8. Defendant Legacy Health ("Legacy") is a 501(c)(3) non-profit corporation registered in Oregon with its principal place of business in Portland, Oregon. Legacy provides an integrated network of health care services, including six hospitals, acute and critical care, inpatient and outpatient treatment, primary and specialty physician services, hospice, laboratory, research, education and a variety of specialty services throughout the Tri-County region.

9. Defendant Providence Health & Services Oregon ("Providence") is a 501(c)(3) non-profit religious corporation registered in Oregon with a principle place of business in Renton, Washington. Providence operates eight hospitals or medical centers throughout Oregon with three major facilities in the Portland Metropolitan Area.

10. Defendant John G. Hunter, M.D., is based in Portland, Oregon as Executive Vice President of OHSU. He is the CEO of the OHSU Health System.

11. Defendant Jeffrey Conklin is based in Portland, Oregon as the Chief Payor Strategy Officer, OHSU, where he is responsible for payer strategy and contracting.

12. Co-conspirator OHSU is an Oregon public corporation with its principal place of business in Multnomah County, Oregon. OHSU is Oregon's only public health sciences university and major academic health center. OHSU owns and operates two hospitals in the Portland area, OHSU Hospital and OHSU Doernbecher Children's Hospital and controls the largest organized clinical practice in Oregon (OHSU Practice Plan). Additionally, OHSU is affiliated with Tuality Healthcare which owns and operates Tuality Community Hospital and Tuality Forest Grove Hospital. OHSU is also affiliated with Adventist Health Portland which owns and operates Adventist Health Portland Medical Center and affiliated clinics.

PAGE 4 – COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

13. Co-conspirator Health Share of Oregon is a non-profit membership corporation domiciled in Oregon. Its member organizations are: Adventist Health, CareOregon, Inc., Central City Concern, Clackamas County, Kaiser Foundation Health Plan of the Northwest and Kaiser Foundation Hospitals, Legacy Health, Multnomah County, Oregon Health & Science University, Providence Health & Services and Providence Health Plan, Tuality Healthcare and Tuality Health Alliance, and Washington County. These members include every major delivery system serving Oregon Health Plan members in the Tri-County Area.

### III. JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction pursuant to 15 U.S.C. §§ 15, 21, 26, and 28 U.S.C. §§ 1331 and 1337.

15. This Court has personal jurisdiction over Defendants under 15 U.S.C. § 15 because they reside in this District.

16. This Court also has personal jurisdiction over the Providence and Legacy Defendants under 15 U.S.C. § 22 because they are corporations that transact business in this District.

17. Venue is proper in this District under 15 U.S.C. § 15 and 28 U.S.C. § 1391, because Defendants are subject to this Court's personal jurisdiction with respect to this action, and a substantial part of the events giving rise to the claims for relief stated herein occurred in this District. In addition, Plaintiff has suffered and will continue to suffer harm in this District as a result of the conspiracy entered into by Defendants.

### IV. FACTUAL BACKGROUND

#### A. Coordinated Care Organizations and CCO 2.0

18. In 2011, Oregon adopted a framework for the Oregon Health Plan, replacing the previous managed care systems for Medicaid recipients. The plan implemented a statewide system of coordinated care organizations for delivering improved care to Medicaid beneficiaries while also lowering costs, such as by reducing the number of expensive emergency room visits.

19.  A Coordinated Care Organization ("CCO") is a network of all types of health care providers (physical health care, addictions and mental health care, and dental care providers) who collaborate in their local communities to serve people who receive health care coverage under the Oregon Health Plan (Medicaid).

20.  Nearly one in four Oregonians receives coverage through OHP, with nearly 88 percent of members enrolled in a CCO.

21.  The Medicaid patient population is a vulnerable population because these patients have very modest means and often lack easy access to health care.

22.  Health Share was the sole incumbent CCO in the Tri-County Area at the time OHA solicited bids for CCO 2.0. Each of the Defendants is a "founding member" of Health Share, and each has "the same rights and responsibilities" in Health Share with respect to voting, dissolution, redemption, and transfer.

23.  CCOs receive annual quality incentive bonuses from the state that the CCO can then disperse to providers. In 2019, Health Share received approximately $70 million in bonus funds for 2018. Health Share has made significant quality incentive payments to each of the Big Three, either directly or to entities in which they have significant interests.

24.  Oregon's so-called CCO 2.0 reforms have expanded the CCO program, with additional oversight, and also added a second CCO to high-population areas such as Lane County and the Tri-County Area.

25.  While CCO 1.0 enhanced collaboration between plans and providers, the CCO 2.0 program focuses on improving care by, among other things, ensuring the adequacy of CCO networks so as not to limit member choice or timely access to providers, and encouraging and rewarding innovative solutions for delivering patient-centered and high-quality care, improving health outcomes, and containing costs.

26.  Under CCO 2.0, in service areas with multiple CCOs, such as the Tri-County Area, members can potentially be assigned to a new CCO plan based on OHA's member

allocation algorithm. Through this algorithm, OHA recommends a particular CCO to each member. The member is automatically assigned to the recommended CCO unless the member affirmatively chooses the other CCO.

27. In assigning members to particular CCOs, OHA seeks to maintain members' access to their primary care providers. As a result, a CCO's network of primary care providers is an important factor in the allocation process. In the absence of other factors, if a member's primary care provider is not part of a particular CCO's network, OHA will not typically assign that member to that CCO. Similarly, if the member does not have an established primary care provider, the member will be randomly assigned to one of the CCOs in the area. Members whose primary care providers have contracted to be in both Health Share's and Trillium's networks will generally be assigned equally between the two CCOs.

28. Network coverage (i.e., the number of health care entities under contract with the CCO) is very important to a CCO because it is the driving variable in OHA's member-allocation algorithm; generally speaking, the greater the provider coverage, the more members a CCO will be assigned.

29. Growing market share after the initial OHA member-allocation process is very difficult. After the allocation by the state, the only way for Trillium to grow its business is either through sign-ups of newly eligible Medicaid patients or getting members to switch from Health Share to Trillium during limited windows of open enrollment.

**B.    The Big Three's Anticompetitive Conduct**

30. On February 1, 2019, Legacy (through PacificSource Community Solutions), Providence (through Providence Health Assurance), and OHSU (through CareOregon Inc.) submitted letters of intent to OHA indicating that each of those hospital groups intended to separately bid and compete for a CCO 2.0 contract award for the Tri-County Area.

31. On February 20, 2019, Legacy, Providence, and OHSU withdrew their individual letters of intent to seek to serve as the CCO for the Tri-County Area. All three made clear that

PAGE 7 – COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

they were choosing not to compete, but rather to support the single CCO 2.0 application of Health Share, the entity in which each of them has financial and other interests. For example, CareOregon's withdrawal letter stated that "Health Share of Oregon's partner organizations, including CareOregon, have committed to working together to co-develop a single application to submit in response to the CCO 2.0 RFA."

32. Also on February 20, 2019, Trillium submitted to OHA its letter of intent to bid for the Tri-County Area CCO 2.0 contract, positioning itself as the only potential competitor to Health Share.

33. After Trillium submitted its February 2019 letter of intent, Trillium reached out to Big Three to procure letters of intent and memoranda of understanding pursuant to which Providence, Legacy, and OHSU would join Trillium's network in the event that Trillium was awarded a CCO 2.0 contract for the Tri-County Area.

34. In responding to Trillium's pre-award outreach, Legacy, Providence, and OHSU had very similar responses. Specifically, each of the Big Three refused to enter into non-binding letters of agreement but told Trillium that they might revisit that decision in the event that Trillium was awarded a contract.

35. Legacy, Providence, and OHSU have regular opportunities to conspire, including in Health Share meetings and other industry meetings.

36. On July 9, 2019, OHA gave notice of its intent to award Trillium a CCO 2.0 contract for the Tri-County Area, conditional on Trillium qualifying as having a sufficient provider network.

37. After being awarded the Tri-County CCO contract on July 9, Trillium immediately reached out to Providence, Legacy, and OHSU to continue its attempts at engaging in negotiations. But the Big Three told Trillium that they had no interest in talking, and intended to support Health Share over Trillium. Once Trillium had its contract, the providers made clear to Trillium that they did not want multiple CCOs in the Tri-County Area.

### 1. Providence

38. Trillium first sought to reach a non-binding letter of agreement ("LOA") with Providence in March 2019, in anticipation of its application to serve as a CCO in the Tri-County Area. Trillium's outreach included a face-to-face meeting in March 2019 and at least four separate e-mail and telephone conversations between April and June 2019, while Trillium's application was pending with OHA.

39. On June 14, 2019, Trillium sent a provider contract offer, consistent with the requirements of the CCO 2.0 program. But Providence did not respond to the proposed LOA or the provider contract and refused all further meetings and substantive conversations.

40. After Trillium was preliminarily awarded its CCO 2.0 contract in July, it again reached out to Providence. Providence advised Trillium that it was "not interested in pursuing any additional conversations." Providence wrote that it was entitled to refuse to contract with Trillium because it had "already entered into a binding obligation to participate in the network of a different CCO" and argued vaguely that its existing contractual obligation "has an effect" on its capacity to contract with any other CCOs.

### 2. Legacy

41. Trillium had in-person and telephonic meetings with Legacy, including with Legacy's Chief Financial Officer and head of managed care contracting. Trillium offered Legacy a competitive rate for reimbursement of services provided by both Legacy's hospitals and physician groups, but Legacy made clear that it would be willing to contract only for hospital services (i.e., that it would not be willing to execute a contract that would bring Legacy's physician groups into Trillium's network) and at a rate that was approximately three times the state Medicare rate.

42. In late August discussions with Legacy, Trillium explained that a whole health system contract (which would include Legacy's primary care physicians) was necessary because OHA's member allocation algorithm was based primarily on the number of in-network primary

PAGE 9 – COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

care physicians. Trillium and Legacy representatives discussed Trillium's proposal and Legacy promised to respond with a counter-offer.

43. The parties met again in early September. During that meeting, Legacy again insisted on a hospital-only contract, and unreasonably demanded a reimbursement rate several times the Medicare reimbursement rate. (Oregon's Medicaid reimbursement rate is 80% of the Medicare rate.) A plan cannot viably operate by paying such high rates.

44. After Legacy's inflated offer, Trillium countered with a more competitive offer. In a meeting with Trillium, Legacy's Chief Financial Officer confirmed that Trillium's offer was competitive with the terms that Legacy had agreed to with Health Share. When asked why Legacy was nevertheless rejecting Trillium's proposal, Legacy stated that "member allocation" was the reason.

45. Accepting Trillium's offer would have placed Legacy in a materially better position than Legacy would otherwise find itself. Hospitals are required to accept emergent Medicaid-eligible patients, regardless of whether the hospital is part of that patient's CCO's network. If the hospital is not part of the patient's CCO's network, the state reimburses the hospital for its services at the state Medicaid rate at around 76% of the Medicare rate. Trillium's proposed reimbursement rate was significantly higher than that. Trillium responded to Legacy by noting Legacy stood to potentially lose several million dollars in revenue because Legacy would be reimbursed at the substantially lower state Medicaid rate for those patients. Nevertheless, Legacy refused to budge from its hospital-only demand.

### 3. OHSU

46. Trillium and OHSU are parties to a Hospital Services Agreement, effective January 1, 2007 ("HSA"), in which OHSU committed to "provide Covered Services to Enrollees" of Trillium, an agreement which still remains in effect.

47. In 2018, Trillium and OHSU entered into a letter of agreement ("LOA") setting forth rates for reimbursement for medical services provided by OHSU. After Trillium submitted

PAGE 10 – COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

its application to OHA to serve as a CCO in the Tri-County Area, Trillium reached out to OHSU to memorialize Medicaid terms in an agreement for the OHSU-affiliated hospitals and physician groups in the Tri-County Area.

48. At a meeting with Trillium representatives in April 2019, OHSU inquired as to whether Trillium intended to rely upon the existing LOA in support of Trillium's application to serve as a CCO for the Tri-County Area. Trillium responded that it intended to do so, and OHSU did not object.

49. After the announcement of the CCO 2.0 awards, Trillium again reached out to OHSU with a proposed amendment to the HSA to provide details regarding the Tri-County Area. OHSU responded, without citation or support, that the HSA and LOA were for Lane County only. OHSU further stated that OHSU "has decided at this time not to enter into a contract with Trillium" because it was "dedicated" to "supporting Health Share's successful transition to CCO 2.0" through OHSU's "position and relationships with Health Share partners."

50. Trillium and OHSU ultimately did engage in some discussions, but OHSU, as directed by Defendants Hunter and Conklin, consistently refused to negotiate in good faith or to offer reasonable terms. For example, although Trillium and OHSU reached an initial understanding that would include OHSU's physician network, OHSU withdrew that offer within days of Legacy making clear that its physician network would not contract with Trillium, either.

51. In response, Trillium representatives suggested to OHSU representatives that it seemed providers did not want to contract with Trillium because they wanted to maximize Health Share's member allocation. OHSU replied that there was "probably something to that."

### 4. Effects of Defendants' and Co-Conspirators' Group Boycott

52. The Defendants' and Co-Conspirators' unlawful boycott has artificially restrained competition in the Tri-County Area Medicaid market. Tri-County Area Medicaid plan beneficiaries and providers have been deprived of the benefits of free and open competition.

PAGE 11 – COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

53.     In defiance of state health policy for CCO 2.0, the Defendants' and Co-Conspirators' illegal boycott is thwarting Oregon's considered decision to offer choice to Medicaid recipients in the Tri-County Area.

54.     The Defendants' and Co-Conspirators' boycott cuts off access to the primary care providers necessary to enable Trillium to compete in the Tri-County Area, where Legacy, Providence, and OHSU possess a dominant market position.

55.     The Defendants' and Co-Conspirators' boycott threatens to prevent the proper allocation of Medicaid plan members among CCOs, resulting in a very low percentage of Trillium plan members. OHA has announced its intention to notify OHP members of their initial CCO allocation. This initial assignment by OHA is the primary means by which a CCO gains members. A poor initial allocation can be detrimental to a CCO's long-term viability. Once those individuals choose their CCO, there is no clear mechanism by which Trillium could compete to win those members.

56.     The Defendants' and Co-Conspirators' boycott has no justification, besides the anticompetitive exclusion of Trillium from the Tri-County Area.

57.     The Defendants' and Co-Conspirators' boycott threatens Trillium's ability to meet the network adequacy requirements set by OHA.

58.     The Defendants' and Co-Conspirators' boycott is already causing irreparable harm to Trillium.

59.     The Defendants' and Co-Conspirators' boycott harms Trillium's reputation and influences the company's ongoing negotiations with providers across products.

60.     The Defendants' and Co-Conspirators' boycott is also harming Trillium's ability to innovate, as having multiple CCOs fosters innovation.

61.     The Defendants' and Co-Conspirators' boycott is also preventing Trillium from developing relationships with county governments, the community, and provider partners, and has damaged those parties' general level of trust in Trillium's efforts to organize an effective and

efficient network and Medicaid plan. The lack of provider contracts harms Trillium's reputation in the market, especially with other providers who might choose not to contract with a plan lacking patient volume.

## FIRST CLAIM FOR RELIEF
(Violation of the Sherman Act, 15 U.S.C. § 1)

62.  Trillium incorporates by reference and re-alleges all previous paragraphs as though fully set forth herein. The group boycott by the Defendants and the Co-Conspirators is an illegal restraint of trade in violation of Section 1 of the Sherman Act.

63.  The Sherman Act prohibits agreements that unreasonably restrict competition. Group boycotts and concerted refusals to deal, like the conspiracy challenged here, are condemned as *per se* illegal. The group boycott and concerted refusal to deal by the Defendants and the Co-Conspirators should be condemned as a *per se* violation of Section 1 of the Sherman Act

64.  The Defendants and Co-Conspirators have entered into an unlawful horizontal agreement to boycott and refuse to deal with Trillium. Such contracts, combinations, or conspiracies among various horizontal competitors to refuse to deal with a plan like Trillium is the type of anticompetitive group boycott agreement subject to *per se* condemnation under Section 1 of the Sherman Act.

65.  The boycott by the Defendants and the Co-Conspirators cuts off access to a supply necessary to enable Trillium to compete, where the Big Three possess a dominant market position, and these practices are not justified by plausible arguments that they enhance overall efficiency or competition.

66.  Trillium has suffered and will continue to suffer antitrust injury to its business and property as a direct and proximate result of the unlawful conspiracy by the Defendants and the Co-Conspirators. Their refusal to contract has subjected Trillium to a group boycott and refusal to deal.

67. The limited CCO exemption to the antitrust laws does not shield this *per se* illegal group boycott by the Defendants and the Co-Conspirators. Indeed, the Defendants' conspiracy is preventing the state's implementation of CCO 2.0, frustrating the policy's choice and innovation objectives.

68. Trillium will lose business and suffer irreparable harm to its business and property as a result of the unlawful conspiracy by the Defendants and the Co-Conspirators. In addition, plan beneficiaries will be injured by the misallocation caused by the Defendants and the Co-Conspirators. Trillium's ability to develop relationships with the county and community will be impaired, and its general trust and support to put together a Medicaid plan will be imperiled.

69. Trillium also seeks damages as to Legacy and Providence, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees. Trillium will prove the amount of damages it has suffered as a result of Defendants' antitrust violation at trial.

## PRAYER FOR RELIEF

70. Declaring that Defendants' and Co-Conspirators' concerted refusal to deal and group boycott is an illegal contract, combination, or conspiracy constituting an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

71. Enjoining the challenged conduct;

72. Ordering Legacy, Providence, and the official representatives of OHSU to negotiate in good faith with Trillium in time for the applicable regulatory deadline for network adequacy;

73. Awarding Trillium treble damages, as well as costs and attorney's fees, in an amount to be proven at trial;

74. Awarding pre-and post-judgment interest at the maximum rate allowable by the law; and

75. Ordering such other relief as the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Trillium demands a trial by jury of all the damages claims asserted in this complaint so triable.

DATED this 24nd day of October, 2019.

> Respectfully submitted,
> *s/ David H. Angeli*
> **ANGELI LAW GROUP LLC**
> DAVID H. ANGELI, OSB NO. 020244
> JOANNA T. PERINI-ABBOTT, OSB. NO 14139
> Ph: (503) 954-2232
>
> Attorneys for Plaintiff Trillium Community Health Plan